# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

STEVEN DALE BELL,                                    1:06-CV-01489 OWW SMS HC

                  Petitioner,          FINDINGS AND RECOMMENDATION
                                                     REGARDING PETITION FOR WRIT OF
    v.                                             HABEAS CORPUS

K. MENDOZA-POWERS, Warden,

                  Respondent.
_____/

      Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL BACKGROUND

      Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Santa Clara, following his conviction by jury trial on April 5, 1995, of attempted first degree murder in violation of Cal. Penal Code §§ 664/187, and assault with a deadly weapon in violation of Cal. Penal Code § 245(a)(1). See Respondent's Answer to Petition (hereinafter "Answer"), Exhibit 1. The jury also found true the enhancements that Petitioner had inflicted great bodily injury and was armed with a deadly weapon during commission of the offense. Id. On June 19, 1995, Petitioner was

1

1  sentenced to serve an indeterminate term of life plus four years in state prison with the possibility

2  of parole. Id.

3      On March 23, 2004, Petitioner's first parole suitability hearing was held before the

4  California Board of Prison Terms (now the Board of Parole Hearings - "Board"). See Answer,

5  Exhibit 5. Petitioner participated in the hearing and was represented by counsel. Id. At the

6  conclusion of the hearing, the Board denied parole and deferred rehearing for two years. Id. at

7  126, 130.

8      Petitioner then sought relief in the state courts. Petitioner filed a petition for writ of

9  habeas corpus in the Santa Clara County Superior Court on March 25, 2005, which was denied

10 on April 7, 2005, in a reasoned opinion. See Answer, Exhibits 6, 7. He then filed a habeas

11 petition in the California Court of Appeals, Sixth Appellate District on July 27, 2005. See

12 Answer, Exhibit 8. That petition was summarily denied on August 4, 2005. See Answer, Exhibit

13 9. On August 6, 2005, Petitioner filed a habeas petition in the California Supreme Court. See

14 Answer, Exhibit 10. On July 19, 2006, the petition was summarily denied. See Answer, Exhibit

15 11.

16     Petitioner filed the instant petition for writ of habeas corpus on September 27, 2006, in

17 the United States District Court, Northern District of California. The petition was transferred to

18 this Court on October 16, 2006. The petition challenges the 2004 decision of the Board denying

19 parole. Petitioner contends the decision violated his constitutional rights under the Fifth and

20 Fourteenth Amendments where the parole hearing was a pro forma sham following

21 predetermined policy, and where the decision was not supported by any evidence.

22     On April 17, 2006, Respondent filed an answer to the petition. Petitioner filed a traverse

23 on June 4, 2007.

**FACTUAL BACKGROUND**[1]

24

25     Petitioner and Cathy met in 1991 and were married in May of 1993. Each had been

26 married before, and each had physical custody of two children from their prior marriages. The

27

28     [1]The information is taken from the factual summary as set forth by the California Court of Appeals in its
opinion affirming the conviction. See Answer, Exhibit 2 at 2-7.

2

four children lived with Petitioner and Cathy in Cathy's house. Before they were married, Cathy told Petitioner that if he had "affairs" after they were married she would divorce him; Petitioner assured Cathy he would not.

In August of 1993, Petitioner received a telephone call from a group of his high school classmates who were planning a reunion. One member of the group was a woman named Sue whom Petitioner had dated some 18 years earlier, before his first marriage. Petitioner told Cathy that he would like to stay in touch with Sue, as an old friend, and Cathy apparently acquiesced in an arrangement under which Petitioner and Sue would exchange occasional letters and telephone calls.

Without Cathy's knowledge, Petitioner and Sue soon became deeply involved in a clandestine sexual relationship consummated at various locations in the western United States. To conceal the relationship with Cathy, Petitioner disguised his various meetings with Sue as business trips and went so far as to prepare false travel invoices to indicate that he had been in cities other than the assignation sites. Until August of 1994, Cathy was aware only of the occasional letters and telephone calls in which she had initially acquiesced. In fact Petitioner managed the logistics of his relationship with Sue largely by means of frequent telephone calls, but because Petitioner paid all the telephone bills and destroyed each bill once it was paid, he was able to conceal those calls that were billed to his home telephone.

On August 3 or 4, 1994, Cathy by chance opened and examined a telephone bill that had come to the house. She found a large number of calls to Chino, and immediately asked Petitioner who lived in Chino. Petitioner acknowledged that it was Sue and explained that he had been trying to give Sue emotional support during the difficult stages of Sue's divorce from her husband. Cathy was upset and indicated she would continue to monitor the telephone bills. Petitioner agreed that he might have been calling Sue too often and that he would cut back.

Approximately two weeks earlier, Petitioner had made reservations to spend the night of August 9 with Sue in San Francisco. His arrangements, and the fact that he followed through with them even after Cathy had confronted him over the telephone bill, reflect both his dedication to his relationship with Sue and the degree of sophistication with which he undertook

to conceal the relationship from Cathy. Shortly before August 9, Petitioner told Cathy that he needed to go to Sacramento on business. At some point he gave Cathy the telephone number of the hotel in which, he said, he would be staying in Sacramento. On August 9 Petitioner did in fact go to Sacramento and check into the hotel. Then, by prearrangement, he met Sue in Sacramento, drove her to San Francisco, took her to dinner and a show, and spent the night with her at an expensive bed and breakfast inn. During the evening, Cathy called the Sacramento hotel; when Petitioner's room did not answer, Cathy called Petitioner's pager number. Petitioner returned Cathy's first pager call from the theater lobby during intermission, explaining the noise by saying he had gone to a Sacramento brew pub for drinks and dinner; he also returned a later pager call, saying he had just returned to his hotel room.

Petitioner returned to Cathy's home on August 10, a Wednesday. Although Petitioner initially seemed to Cathy to be somewhat withdrawn, Petitioner and Cathy had sexual intercourse twice on Friday, and Cathy's brother, who came to the home for dinner and spent the night on Saturday, testified that the interactions between Petitioner and Cathy were "real good" and that it was a "pleasant evening." "[E]verybody seemed pretty happy" at breakfast on Sunday. The brother left around 10:00 a.m.

By prior arrangement both of Cathy's children planned to spend Sunday night in Monterrey County. Petitioner's children were due to return from extended visitation with their mother late Sunday, but on Friday Petitioner had called his former wife to ask that the children be returned on Monday, rather than Sunday, so that Petitioner and Cathy could have a night alone together.

It had been Petitioner's custom throughout his brief marriage to Cathy to commemorate their wedding on the fifteenth day of each month. August 15, 1994, fell on Monday. On Saturday Petitioner told Cathy he had bought her a present but would not give it to her until the children were gone.

On Sunday evening all the children were gone. At bedtime, Petitioner gave Cathy a sentimental card and a wrapped recording of the soundtrack from the movie, "Forrest Gump." It appears that this soundtrack was something Petitioner had wanted for himself; Cathy commented

that she appreciated the card but that Petitioner need not obtain things he wanted by buying them to give to her. Petitioner and Cathy argued; Petitioner accused Cathy of being controlling, said that he could not sleep and would go downstairs to read, and left the bedroom. Cathy then went to her daughter Lauri's bedroom and lay down on Lauri's bed. Shortly thereafter Petitioner returned upstairs and he and Cathy agreed to return to their own bed. After further conversation they hugged and apologized to each other.

The alarm went off shortly after 6:00 a.m. Monday morning. Cathy asked Petitioner to shower first because she was tired. Shortly thereafter Petitioner awakened Cathy by kissing her on the cheek. As she stood to walk to the bathroom Petitioner asked her to sit back down on the bed and close her eyes because he had another present for her. Cathy sat down and closed her eyes; she heard rustling which seemed to come from the closet.

Cathy sensed nothing further until she found herself on her back on the floor with a plastic bag stretched tightly over her face. She thought she was dying. She felt hands holding the plastic bag, and struggled to escape the hands. Then suddenly the plastic bag was removed and she saw Petitioner standing over her.

Petitioner expressed concern, saying that she had hurt herself and that she should get into the shower to wash off the blood. Cathy determined that she was bleeding from a cut on the back of her head; she walked into the shower and turned on the water, but the water made her feel dizzy and sick and she immediately left the shower and walked back into the bedroom.

On the bed, as she walked back into the bedroom, Cathy saw a club-like device constructed of pieces of metal pipe. She had never seen the device before. When she saw the device, Cathy concluded that Petitioner had tried to kill her. She lay down on the bed, and asked Petitioner to call for help. Then Cathy began to scream. Ultimately Petitioner did call 911 and police and paramedics responded.

Cathy was taken to a hospital. Based on Cathy's statements and the situation as they perceived it, the police arrested Petitioner and removed him from the home. Upon subsequent search police found the pipe device, and a plastic bag of the kind Cathy described, under the coverlet on the bed in Lauri's bedroom. Blood found on the device and on the bag was subjected

5

to DNA testing, on the basis of which a criminalist testified that the blood did not match Petitioner's but could be a match for Cathy's.

Cathy was found to have suffered a blunt-instrument wound to the back of her head which required sutures to close; she was treated and released later in the day, but experienced ongoing neurological symptoms thereafter.

Later on Monday, police investigators contacted Sue, who acknowledged her sexual liaisons with Petitioner. On Tuesday a police detective told Cathy about the sexual liaisons; this was the first Cathy had heard or suspected of the sexual nature of Petitioner's relationship with Sue.

Petitioner's only articulated theory of defense at trial was that he had not attacked Cathy. He testified that the only discussion of a present for Cathy had referred to the "Forrest Gump" soundtrack, and that he had given her the soundtrack on Monday morning rather than on Sunday evening. He testified that Cathy did remark that he need not give her things he wanted for himself, but denied that there was any serious argument. He testified that "the incidents [incidence?] of our communication discussions had increased" since January 1994, "[b]ut I don't think there was anything special in those last couple of months . . ." The "discussions" had usually involved the children, or Petitioner's difficulties in relating to one of Cathy's brothers, "[a]nd there were some issues that we just didn't communicate well on." But when defense counsel asked him whether, on August 15, he felt "like you were being squeezed in a certain fashion, emotionally or otherwise, where you felt trapped," Petitioner replied, "Not at all."

Petitioner testified that as Cathy stood up to go to the bathroom he turned away, and that he then heard a thump and turned to find her lying on the floor, bleeding, with her arm entangled in a plastic bag. Petitioner testified that he assumed Cathy had fallen and had hit her head on a piece of furniture. He acknowledged that he had previously built the pipe device, as protection against intruders, but said that Cathy had known about the device and had insisted it be kept in the closet rather than near the bed and that Petitioner had last seen the device in the closet the night before. Petitioner insisted that he had only tried to help Cathy to disentangle herself from the plastic bag, and to clean her wound and persuade her to remain quiet while he obtained

1    medical aid for her.

2                                   **DISCUSSION**

3    I.        Standard of Review

4          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

5    of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

6    enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries

7    v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th

8    Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

9    521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).

10   The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its

11   provisions.

12         Petitioner is in custody of the California Department of Corrections pursuant to a state

13   court judgment. Even though Petitioner is not challenging the underlying state court conviction,

14   28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the

15   threshold requirement of being in custody pursuant to a state court judgment. Sass v. California

16   Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370

17   F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a

18   state prisoner in custody pursuant to a state court judgment, even when the petition is not

19   challenging [her] underlying state court conviction.'").

20         The instant petition is reviewed under the provisions of the Antiterrorism and Effective

21   Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63,

22   70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the

23   adjudication of the claim "resulted in a decision that was contrary to, or involved an

24   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

25   of the United States" or "resulted in a decision that was based on an unreasonable determination

26   of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.

27   § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

28         As a threshold matter, this Court must "first decide what constitutes 'clearly established

                                              7

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

8

1    AEDPA requires that we give considerable deference to state court decisions. The state

2    court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

3    interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*,

4    537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

5    II.    Review of Petition

6    A parole release determination is not subject to all the due process protections of an

7    adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see

8    also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural

9    protections that particular situations demand). "[S]ince the setting of a minimum term is not part

10    of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not

11    constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at

12    1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole

13    board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive

14    advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an

15    "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the

16    inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the

17    Board must be supported by "some evidence" having an indicia of reliability. Superintendent,

18    Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th

19    Cir.1987).

20    "In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not

21    comport with 'the minimum requirements of procedural due process,' unless the findings of the

22    prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454

23    (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128.  In

24    determining whether the "some evidence" standard is met, the Court need not examine the entire

25    record, independently assess the credibility of witnesses, or re-weigh the evidence.  Id.  Rather,

26    the Court must determine whether there is any evidence in the record that could support the

27    conclusion of the disciplinary board.  Id., *citing* Superintendent v. Hill, at 455-56.  Although Hill

28    involved the accumulation of good time credits, the same standard applies to parole, as both

9

situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the BPH is guided by the following regulations:

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

Further, when an inmate is considered for the first time at the initial parole consideration hearing, "[a] parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). 15 Cal. Code Regs. § 2401.

In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner was provided all that is required. Petitioner was given advance notice of the hearing, he was represented by counsel at the hearing, he was granted an opportunity to submit materials for the Board's consideration and an opportunity to be heard during the hearing, and he was provided a written decision explaining the reasons why parole was denied. See Answer, Exhibit 5.

Petitioner, however, contends the Board's decision was arbitrary, capricious and had no evidentiary support. After reviewing all relevant evidence, the Court finds that the state court rejection of Petitioner's claims was not unreasonable, because the Board's decision is supported by "some evidence."

Title 15, of the California Code of Regulations, Section 2402(c) sets forth certain

negative factors which the Board would consider in determining whether Petitioner is suitable for parole.

Section 2402(c) provides:

> Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> > (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
> >
> > > (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> > >
> > > (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> > >
> > > (C) The victim was abused, defiled or mutilated during or after the offense.
> > >
> > > (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> > >
> > > (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
> >
> > (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
> >
> > (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
> >
> > (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
> >
> > (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
> >
> > (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

15 Cal.Code Regs. § 2402(c).

In denying parole in 2004, the Board considered and found the circumstances of the commitment offense indicated unsuitability. Pursuant to § 2402(c)(1), the Board found the

1  offense was especially heinous, atrocious, or cruel.[2] In making this finding, the Board relied on

2  factors (B), (C), (D), and (E).

3      Pursuant to § 2402(c)(1)(B), the Board found the attempted first degree murder was

4  carried out in a dispassionate and calculated manner. This finding is certainly supported by

5  "some evidence." On the morning of the incident, Petitioner awoke his wife by kissing her on the

6  cheek. He then asked her to sit on the edge of the bed and close her eyes because he had a present

7  for her. As she sat there with her eyes closed, Petitioner took a metal club fashioned out of metal

8  pipe pieces and struck her in the back of the head knocking her to the floor unconscious.

9  Petitioner then took a plastic bag and attempted to suffocate her.  These facts clearly show a cool,

10  dispassionate, and calculating attitude befitting an execution-style attempted murder pursuant to

11  § 2402(c)(1)(B). There is ample evidence to support this finding.

12      The Board also found the victim was abused pursuant to § 2402(c)(1)(C). The Court can

13  find no evidence to support this finding. It is true Petitioner held a bag over the victim's face to

14  asphyxiate her, but this fact does not support the finding that the victim was abused, defiled or

15  mutilated before, during, or after the attempted murder. Thus, there is no evidence to support this

16  finding.

17      The Board next found the offense was carried out in a manner which demonstrates an

18  exceptionally callous disregard for human suffering under § 2402(c)(1)(D). To merit this finding,

19  "the offense in question must have been committed in a more aggravated or violent manner than

20  that ordinarily shown in the commission of" attempted first degree murder. In re Scott, 119

21  Cal.App.4th 871, 891 (2004). Examples of aggravated conduct which would reflect this factor

22  "are set forth in Board regulations relating to the matrix used to set base terms for life prisoners

23  (§ 2282, subd. (b)); namely, 'torture,' as where the 'victim was subjected to the prolonged

24  infliction of physical pain through the use of non-deadly force prior to act resulting in death,' and

25  'severe trauma,' as 'where [d]eath resulted from severe trauma inflicted with deadly intensity;

26  e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted

27  ────────────

28  [2]The Board actually stated the "offense was carried out in an especially cruel and callous manner." See
Answer, Exhibit 5.

12

with a weapon not resulting in immediate death or actions calculated to induce terror in the

victim.'" Id. at 893 (footnote omitted), *quoting*, In re Van Houten, 116 Cal.App.4th 339, 351

(2004). Here, there is no evidence that the victim was tortured in such a manner as to prolong the

infliction of physical pain with non-deadly force. However, there is evidence that Petitioner

inflicted severe trauma with deadly intensity. And, the victim was beaten or clubbed and then

suffocated in such a manner as not to cause immediate death but induce terror in the victim. The

victim was deceived into closing her eyes and sitting on the edge of her bed to await a "present"

on a special day. This "present," from her husband who she trusted, turned out to be a massive

blow delivered to the back of her head with a metal pipe followed by suffocation with a plastic

bag. There is some evidence to support the Board's finding.

Finally, the Board found the motive to be inexplicable, or at the very least, trivial

pursuant to § 2402(c)(1)(E). It is true the motive cannot be both, but contrary to Petitioner's

arguments, the Board did not make this finding. Since Petitioner did not offer any explanations

for his actions at the hearing or at trial, the Board could not firmly identify a motive for the

crime. Thus to this extent, the motive was inexplicable. There was argument presented at trial

that Petitioner stood to gain financially in the event the victim died, but Petitioner states this

would have been very little considering Petitioner's own assets and earnings and most would

have gone to the victim's children. There was also argument presented that the pressures of

marital discord and the affair had built up to such a point as to make Petitioner feel emotionally

squeezed or trapped, but Petitioner testified that this was not the case. Thus, to the extent these

may have been Petitioner's motives, the Board understandably considered them most trivial. For

these reasons, there is some evidence to support the Board's finding that the motive was either

inexplicable, or at best, very trivial.

In addition to the commitment offense, the Board noted the in-person oppositions of the

District Attorney and the victim weighed against suitability. Cal. Penal Code § 3042(f)(3)

provides that the Board "shall review and consider all information received from the judge or any

other person and shall consider adjusting the terms or conditions of parole to reflect the

comments or concerns raised by this information, as appropriate." Further, Cal. Penal Code

§ 3043(e) states that "[t]he board, in deciding whether to release the person on parole, shall consider the statements of the victim or victims, next of kin, immediate family members of the victim, and the designated representatives of the victim or next of kin, if applicable, made pursuant to this section and shall include in its report a statement of whether the person would pose a threat to public safety if released on parole." Therefore, the Board properly considered the arguments of the district attorney and the victim in the case in determining Petitioner continued to pose a threat to public safety if released on parole.

At Petitioner's parole hearing, the victim stated she continued to live in fear for her safety and believed there was a strong likelihood that Petitioner would seek retribution against her and her family should he be released. She stated she had been contacted by the television show, "Unsolved Mysteries," regarding a book written by Petitioner which was presented to the television show with the intent that an episode be produced on the subject. In the book Petitioner apparently maintains he was wrongly accused and convicted and that the victim continually lied and schemed against him. In addition, the victim stated Petitioner had created a 12-page website devoted to his case in which Petitioner maintains his innocence. The victim alleged the website contains many exaggerations, innuendos and lies. She stated it was this behavior on Petitioner's part that caused her to continue to fear for her life. Petitioner, on the other hand, stated none of this information was true, that he had not written a book, and that he had not created a website. In any case, the victim's testimony was properly considered under Cal. Penal Code §§ 3042, 3043. See In re Dannenberg, 34 Cal.4th 1061, 1084 (2005).

As for the remaining factors of unsuitability in § 2402(c), the Board found no evidence to support them. Petitioner had no prior record of violence, a stable social history, no prior sexual offenses, no apparent mental problems related to the offense, and no incidence of serious misconduct while incarcerated.

The Board also considered the various circumstances demonstrating suitability pursuant to § 2402(d). The Board noted Petitioner did not have a juvenile record or a criminal history. The Board further noted Petitioner had a very stable social history; Petitioner was well-educated and raised in a loving dual-parent household, and he never abused drugs or alcohol. The Board also

14

noted that Petitioner had remained completely disciplinary-free in prison. In addition, the Board found Petitioner had programmed well while in prison. Although Petitioner had upgraded himself vocationally, the Board recommended that Petitioner should continue to involve himself in positive programs to enable him to understand and cope with stressful situations in a non-destructive manner. Nevertheless, the Board found these positive factors, while promising for a possible future grant of parole, did not outweigh the Board's determination that Petitioner remained an unreasonable risk of danger to society if released. The gravity of Petitioner's offense was more indicative of a danger to the public, especially for those in close relationship with Petitioner, than would ordinarily be the case.

It is apparent the Board considered all relevant evidence in this case and carefully balanced and assessed the various factors. Those findings were supported by at least "some evidence."

Petitioner also claims the Board improperly relied on Petitioner's refusal to discuss the commitment offense in denying parole. Petitioner is mistaken. The Board did not deny parole because Petitioner failed to discuss his crime. As discussed above, parole was denied on the basis of the especially heinous, atrocious, or cruel manner Petitioner had committed the offense. The Board remarked that Petitioner should explore the commitment offense and the underlying causes, but this recommendation was obviously made to enable Petitioner to demonstrate he no longer presented as an unpredictable danger to the public, despite the facts of the commitment offense.

Petitioner next claims a negative informational "chrono" in his file was improperly relied on by the Board in finding him unsuitable. He complains that the chrono was drafted by an individual who used a false identity and has since been removed from the prison. However, the chrono was not relied upon by the Board to deny parole. The Board never stated it was recommending additional programming because Petitioner demonstrated an anger control problem in prison. Rather, the Board commended Petitioner for remaining disciplinary-free. With respect to the Board's recommendation to seek further self-help programming, obviously this was made in reference to the commitment offense itself.

Petitioner also takes issue with the fact that the Board denied rehearing for a period of two years rather than the normal annual review. Cal. Penal Code § 3041.5(b)(2) states:

> The board shall hear each case annually thereafter, except the board may schedule the next hearing no later than the following:
> ...
>> (A) Two years after any hearing at which parole is denied if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding.

In this case, the Board found it was not reasonable to expect parole would be granted at a hearing in the next two years, and the Board provided its reasons for the finding. Petitioner claims the Board relied on virtually the same reasons in denying parole for two years. However, the Board did not rely solely on the same reasons provided for the denial of parole. The Board determined not only that parole should be denied, but a longer period of observation would be necessary to determine whether Petitioner remained unpredictable and posed an unreasonable danger. Furthermore, Petitioner is complaining about the state's application of its own law and the claim is therefore not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989) (Federal courts are bound by state court rulings on questions of state law.).

Petitioner also claims the Board is operating under an illegal policy denying parole to all prisoners at their initial parole consideration hearing. The claim is conclusory and unsupported by any evidence. See Allard v. Nelson, 423 F.2d 1216, 1217 (9th Cir.1970) (Conclusory allegations in a habeas petition fail to state a claim and do not suffice to shift the burden to the state to answer an order to show cause.); James v. Borg, 24 F.3d 20, 29 (9th Cir.1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."); Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (holding that conclusory allegations made with no reference to the record or any document do not merit habeas relief). In

1  addition, there is no indication that the Board did anything but carefully consider each factor in

2  evaluating Petitioner at his initial parole release hearing.

3  In light of the above, it cannot be said that the state court resolution of Petitioner's claims

4  "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

5  established Federal law, as determined by the Supreme Court of the United States" or "resulted

6  in a decision that was based on an unreasonable determination of the facts in light of the evidence

7  presented in the State Court proceeding." 28 U.S.C. § 2254(d).

8  **RECOMMENDATION**

9  Based on the foregoing, it is HEREBY RECOMMENDED that:

10  1.    The petition for writ of habeas corpus be DENIED; and

11  2.    Judgment be ENTERED in favor of Respondent.

12  This Findings and Recommendations is submitted to the assigned United States District

13  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

14  the Local Rules of Practice for the United States District Court, Eastern District of California.

15  Within thirty (30) days after being served with a copy, any party may file written objections with

16  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

17  Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

18  and filed within ten (10) court days (plus three days if served by mail) after service of the

19  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

20  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

21  may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

22  Cir. 1991).

23  IT IS SO ORDERED.

24  **Dated:   November 27, 2007**              **/s/ Sandra M. Snyder**
                                            UNITED STATES MAGISTRATE JUDGE

25

26

27

28